UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| **HAMMOND TRANSPORTATION, INC.**<br><br>    **Plaintiff,**<br><br>**V.**<br><br>**COTTINGHAM & BUTLER<br>INSURANCE SERVICES, INC.,** *et al.*<br><br>    **Defendant.** | **CIVIL ACTION NO. 5:13-274-KKC**<br><br><br>**<u>OPINION AND ORDER</u>** |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on the defendants' motion for summary judgment on all claims pursuant to Federal Rule of Civil Procedure 56(a). [DE 25]. For the reasons stated below, the Court will grant the defendants' motion.

## I. BACKGROUND

Defendant Cottingham & Butler Insurance Services, Inc., is an insurance broker that obtains insurance coverage for its clients. [DE 25-1, Mot. for Summ. J. at 4.] Seth Maxwell, the other defendant in this matter, is a Vice President of Cottingham & Butler. [DE1, Complaint ¶ 5.] Plaintiff Hammond Transportation, Inc. ("HTI") is a trucking company engaged in the business of hauling freight. [DE 1-1, Complaint at ¶ 2.]

The relationship between the parties began in late 2011, when Mr. Maxwell met with Tony Hammond[1] of HTI on two occasions to discuss HTI's insurance coverage and solicit new insurance business. [DE 25-1 at 4; DE 26, Plaintiff's Response at 2.] During the meetings, Mr. Maxwell told Mr. Hammond that Cottingham & Butler would provide HTI with the "best insurance" available and also assist in training HTI's drivers. [DE 26-2,

---

[1] Tony Hammond "runs" HTI, but no official title is provided. [DE 26 at 2.]

Exhibit 2, Deposition of Tony Hammond in his capacity as plaintiff's corporate representative at 70:7-9.]

After the meetings, HTI decided to change its insurance "broker of record" from a previous agency to Cottingham & Butler. [DE 25-2 at 36:13-20.] With Mr. Hammond's authorization, Cottingham & Butler procured several different insurance policies for HTI, including an auto liability policy, a physical damages policy, a cargo policy, and a workers compensation policy. [DE 25-1 at 4-5.] The auto liability policy is the main focus of this case, and, to a much lesser degree, the physical damages policy is also relevant.

Mr. Maxwell transmitted a letter dated January 23, 2012 ("January 23, 2012 letter") [DE 26-1, Deposition Exhibit 3 at 33] and Cottingham & Butler marketing materials [DE 26-1, Deposition Exhibit 50 at 44] to Mr. Hammond. It is not clear whether these materials were sent to Mr. Hammond before HTI agreed to use Cottingham & Butler as its insurance broker or after the agreement was formed. Either way, Mr. Hammond never signed the January 23, 2012 letter and insists he "did not agree" to its terms. [DE 26 at 5.]

An auto liability policy covers costs for bodily or property damage to others caused by the insured. [DE 26 at 2.] In order to acquire this insurance policy for HTI, Cottingham & Butler needed a projected mileage estimate for HTI's fleet of trucks for the upcoming year. [DE 25-1 at 5.] A mileage estimate was required on the auto liability policy application and is used to set premiums. HTI's Vice President of Operations, Randy Minnicks, provided a mileage estimate of 10,524,800 miles to Cottingham & Butler. [DE 25-1 at 5; DE 26 at 6.] Mr. Maxwell incorporated this mileage estimate into an application for auto liability insurance, which Mr. Minnicks signed on behalf of HTI. [DE 25-1 at 6.]

Using the application that contained the 10,524,800 mile estimate, Mr. Maxwell arranged for an auto liability policy with Illinois National Insurance Company (referred to by the parties as "Chartis"), with an annual premium of $339,900. [DE 25-1 at 6-7; DE 26

2

at 4.] Mr. Maxwell did not have a personal appointment to sell insurance [DE 26 at 21.], but his employer, Cottingham & Butler, was an appointed agent of Chartis at all relevant times. [DE 27 at 11.]

HTI was unable to pay the entire $339,900 at one time, so it entered into a Premium Finance Agreement ("financing agreement") with Imperial Credit Corporation ("Imperial"). [DE 25-1 at 8.] Under the terms of the financing agreement, HTI was to make an initial down payment of $50,985.00 and nine monthly installments of $32,502.92 to Imperial. [DE 25-1 at 8-9.] The agreement gave Imperial "full authority, in the event of default, to (i) cancel [the Chartis policy]" and further provided that Imperial "may cancel [the Chartis policy] after providing at least 10 days written notice of intent to cancel . . . if the insured does not pay any installment . . ." [DE 25-1 at 8.]

While securing the auto liability policy and financing, the parties also discussed Cottingham & Butler's fee. The parties continue to dispute the precise amount of the fee. Cottingham & Butler asserts that HTI agreed to pay a $27,000 fee [DE 25-1 at 7.] HTI maintains that where Cottingham & Butler received a fee directly from Chartis, HTI was not required to pay anything to Cottingham & Butler, but if Cottingham & Butler received nothing from Chartis, HTI would pay a fee equal to 6% of the premium amounts. [DE 26 at 5.] It is also unclear when exactly HTI agreed to pay a fee, as Mr. Hammond never agreed to the terms of the January 23, 2012, letter that contained a fee schedule [DE 26 at 5.], but later acknowledged that a fee was owed when he told Mr. Maxwell in an email that he had "every intention of paying you your fees." [DE 25-1 at 7.] Cottingham & Butler brought a counterclaim for payment of its fee, but is not seeking summary judgment on that claim. [DE 25-1 at 7-8.]

HTI's first installment payment to Imperial under the financing agreement was due on February 25, 2012. [DE 25-9, Exhibit 8, Imperial Account Ledger for Hammond

Transportation.] HTI paid the February installment late, on March 9, 2012. [DE 25-9, Exhibit 8.] HTI also did not make its March premium payment [DE 25-9, Exhibit 8.]

On April 9, 2012, Mr. Hammond emailed Mr. Maxwell to inform him that HTI had overstated the estimated mileage used in the auto liability policy application. [DE 25-1 at 9; DE 26 at 6.] This was important to HTI, as a lower estimated mileage would yield a lower premium. Cottingham & Butler negotiated a mid-term change to the policy with Chartis, which would reduce the estimated mileage from 10,524,800 miles to 8,400,000 miles. [DE 25-1 at 10; DE 26 at 6.] In turn, the annual premium would be reduced from $339,900 to $271,992, a difference of $67,908. Once the change became effective, HTI would also receive a refund from Chartis for past premium amounts paid in excess of the new amended premium rate.

Mr. Hammond testified during his deposition that Mr. Maxwell told him to hold payment on the Imperial financing agreement while the change to the auto liability policy was being negotiated. [DE 26 at 7.] HTI did not pay Imperial the April installment when it was due. [DE 25-9, Exhibit 8.]

At this point, in May, 2012, Imperial, who had the power to cancel the Chartis policy for missed premiums under the financing agreement, insisted on receiving the missed March and April premium payments before allowing the mid-term change to go into effect. [DE 25-1 at 10-11.] Mr. Maxwell told Mr. Hammond to issue a check for $66,549.74 to Imperial for the outstanding March and April installments. [DE 26 at 7.] HTI tendered a check to Imperial for that amount. This allowed the mid-term change to the Chartis auto liability policy to go into effect on or about May 30, 2012. [DE 25-1 at 11.] Mr. Hammond believed that HTI was going to receive the refund of excess premium payments from Chartis before it had to pay the $66,549.74 to Imperial. [DE 25-2 at 84:14-23.] When it became evident to Mr. Hammond that this would not happen, HTI "put a stop payment on

4

the $66,549.74" check it gave to Imperial. [DE 25-2 at 84:22-23.] Then, when Cottingham & Butler eventually received the refund from Chartis in mid-June in the amount of $69,130, it transferred the full amount of the refund to Imperial, which applied it toward the missed installments. [DE 26-9, Exhibit 8.]

After this refund was transferred to Imperial, HTI made no further installment payments directly to Imperial. [DE 25-1 at 11.] Therefore, Imperial exercised its right under the financing agreement to cancel HTI's auto liability policy with Chartis.

On June 19, 2012, Mr. Maxwell sent an email to Mr. Hammond, stating: "Tony: per our discussion, please see attached. We will continue to work on the financing and ultimate re-instatement of the policy." [DE 25-11, Exhibit 10.] Attached was a letter informing Mr. Hammond that HTI's auto liability policy had been cancelled effective June 20, 2012. [DE 25-11, Exhibit 10.] Mr. Hammond replied with an email, which stated: "I understand. Thanks." [DE 25-11, Exhibit 10.] HTI now disputes that the letter was actually attached to the email [DE 26 at 11.] and asserts that Mr. Hammond did not learn of the cancellation until twelve days later [DE 26 at 9.], but it is undisputed that HTI's auto liability policy was in fact cancelled on June 20, 2012. [DE 25-1 at 11-12; DE 26 at 7.]

On the same day, June 20, 2012, HTI wired Cottingham & Butler $70,000 in an unsuccessful attempt to maintain its auto liability coverage. [DE 25-1 at 12; DE 26 at 8.] Ultimately, $54,795.56 of the $70,000 was sent to Imperial, and $15,204.44 "was applied to the outstanding C&B Fee Agreement invoices." [DE 26-1, Exhibit 1, Deposition Exhibit 53 at p.68.]

While all of this was occurring, Chartis also apparently cancelled HTI's physical damages policy. [DE 1-1, Complaint at ¶ 30.] The parties do not provide any elaboration on the circumstances surrounding the cancellation of that policy. However, Cottingham & Butler received a second $72,021 refund from Chartis due to this cancellation. [DE 25-2 at

5

133:14 – 135:15.] Cottingham & Butler transferred $58,822.75 to First Insurance Funding, which presumably financed the physical damages policy, and remitted the remaining $13,198.22 back to HTI. [DE 25-2 at 13:14 – 135:15.]

Finally, on August 2, 2012, HTI terminated Cottingham & Butler as its insurance broker and hired Brower Insurance Agency as its new broker. [DE 25-1 at 12; DE 26 at 14.] Brower obtained auto liability coverage for HTI with the same insurer, Chartis, "within a day or so." [DE 26 at 9.] HTI sued Cottingham & Butler and Mr. Maxwell in state court, seeking damages for hauling business HTI lost due to its lack of auto liability insurance coverage [DE 1-1, Complaint at ¶ 47.] and for overpayment of premiums under the original Chartis policy [DE 1-1, Complaint ¶ 58.]. The Defendants removed the case to this Court then filed the current motion for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine issue as to any material fact" regarding any essential element of plaintiff's case and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

There is no genuine issue of material fact when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, it is incumbent upon the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S.

at 248; *Andrews v. Hickman County, Tenn.*, 700 F.3d 845, 852 (6th Cir. 2012); *see also* Fed. R. Civ. P. 56(c). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## II. ANALYSIS

HTI asserts claims against Cottingham & Butler and Mr. Maxwell in his personal capacity for breach of contract, negligence, disgorgement, and premium refund.

**A. Individual Liability of Mr. Maxwell**

At all times, Mr. Maxwell was acting as an agent of Cottingham & Butler, a disclosed principal. HTI was clearly aware that Mr. Maxwell was working for Cottingham & Butler. Therefore, Mr. Maxwell cannot be held personally liable to HTI.

Under Kentucky law, the agent of a disclosed principal cannot be held liable for acts done within the scope of their agency. *Summit Petroleum Corp. of Ind. v. Ingersoll-Rand Fin. Corp.*, 909 F.2d 862, 868 (6th Cir. 1990) ("Kentucky law insulates agents from liability for 'acts done within the scope of [their agency] on behalf of a disclosed principal.'"); *N. Ridge Farms, Inc. v. Stathatos*, 760 S.W.2d 89, 91 (Ky. App. 1988); *Am. Collectors Exchange, Inc. v. Ky. State Democratic Central Comm.,* 566 S.W.2d 759, 761-62 (Ky. App. 1978).

Here, Mr. Maxwell was employed as a Vice President of Cottingham & Butler. [DE 1-1, Complaint ¶ 5.] There is no question that from the start HTI knew of Cottingham & Butler's existence and understood that Mr. Maxwell was an employee. HTI does not claim that Mr. Maxwell exceeded the scope of his agency. Therefore, HTI cannot sue Mr. Maxwell individually for his acts on behalf of a disclosed principal.

HTI argues that "when Mr. Maxwell sold an insurance policy he was not properly appointed to sell, he became personally liable to HTI as the insured for any damages suffered by HTI as a result of that sale." [DE 26 at 27.] However, Mr. Maxwell did not act as the "seller" in any personal capacity. He dealt on behalf of Cottingham & Butler at all times. This is reflected by the fact that Cottingham & Butler was listed as the "Producer"[2] on the Chartis auto liability policy. [DE 27 at 10.] Furthermore, Cottingham & Butler was properly appointed by Chartis. [DE 27 at 9-10.] HTI does not dispute that Cottingham & Butler was properly appointed. Whether Mr. Maxwell was personally appointed is not dispositive, as he was acting within the scope of his employment for a disclosed principal that was the properly appointed agent of an insurer.

For this reason, HTI's four causes of action cannot be asserted against Mr. Maxwell personally, but only against Cottingham & Butler.

**B. Contract Claim**

HTI asserts that Cottingham & Butler "breached their agreement with Plaintiff to procure the best liability insurance coverage available" in two ways: (1) "[B]y having the Chartis Policy written with an incorrectly stated amount for Estimated Mileage," and (2) "[B]y failing to timely and fully advise Plaintiff on paying the Chartis Policy Premium and in general on keeping the coverage provided under the Chartis Policy in effect during the policy period." [DE 1-1, Complaint at ¶ 52.]

*1. Estimated Mileage*

HTI provided the overstated mileage estimate of 10,524,800 miles to Mr. Maxwell in order to secure the Chartis auto liability policy. Therefore, no reasonable jury

---

[2] *See, e.g.*, Ky. Rev. Stat. Ann. § 304.3-400 (West) (defining "producer" as an entity that "acts or aids in any manner in soliciting, negotiating, or procuring the making of any insurance contract on behalf of an insured…").

8

could find that Cottingham & Butler breached any contractual duty it might have owed to HTI by including this estimate in the insurance policy application.

All of the evidence, both testimonial and documentary, clearly shows it was HTI that provided the mileage estimate to Cottingham & Butler. [DE 25-3, Exhibit 2, Deposition of Randy Minnicks at 43:18 – 48; DE 25-4, Exhibit 3, Auto Liability Application.] Even HTI acknowledges that it provided the estimate. [DE 26 at 6.] ("Minnicks gave Cottingham & Butler the number 10,500,00 for the estimated annual mileage during the year term of the Chartis Auto Policy.").

Since it is undisputed that HTI provided the mileage estimate to Cottingham & Butler for the purpose of securing an auto liability policy, there are no facts upon which a jury could find that Cottingham & Butler breached by "having the Chartis Policy written with an incorrectly stated amount for Estimated Mileage." [DE 1-1, Complaint at ¶ 52.] Cottingham & Butler simply utilized the mileage estimate supplied by HTI.

### 2. Failure to Advise

HTI's second breach of contract argument also fails because HTI cannot prove that that Cottingham & Butler had a contractual obligation to advise HTI about paying the Chartis policy premium or "in general" about maintaining coverage under the policy. Without a contractual duty to provide advice, Cottingham & Butler cannot be liable to HTI for breach of contract.

To prove a breach of contract, a plaintiff must establish three things: (1) existence of a contract; (2) breach of that contract; and (3) damages flowing from the breach of that contract. *Barnett v. Mercy Health Partners –Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007). "[T]o be enforceable, a 'contract must contain definite and certain terms setting forth promises of performance to be rendered by each party.'" *Id.* (citing *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997)).

9

Based on the evidence presented, a rational jury could not find that Cottingham & Butler had a contractual obligation to provide ongoing advisement to HTI. There is no final, signed contract memorializing the terms of the agreement in this case. Rather, HTI argues that several items in the record show a contractual duty to advise: "1) the January 23, 2012 letter, 2) the Cottingham & Butler solicitation materials, 3) Defendants' specific promises to HTI, and 4) email exchanges between Maxwell and Hammond." [DE 26 at 16.] Even taken together, these materials do not show that Cottingham & Butler entered into an agreement in which it was contractually required to advise HTI on paying and maintaining its auto liability coverage.

First, although the word "advise" appears in the January 23, 2012, letter, HTI expressly stated in its Response opposing summary judgment that Mr. Hammond "never signed the letter" and is adamant that he "did not agree to that." [DE 26 at 5.] Therefore, HTI cannot rely on the letter as the basis of a contractual duty when it also asserts it did not agree to the terms presented in the letter. It is true that Mr. Hammond was more concerned with the fee amounts listed in the letter when he refused to accept it, but Mr. Hammond nevertheless failed to accept HTI's proposed terms. A single line in an unaccepted offer cannot be the only foundation for an otherwise unsupported contract obligation. In fact, because Mr. Hammond further negotiated with Cottingham & Butler about its fee, it is probably most accurate to say that HTI actually made a counter offer and thereby *rejected* the offer Cottingham & Butler made in the January 23, 2012 letter.

Furthermore, Mr. Hammond's deposition testimony undermines the assertion that Cottingham & Butler promised to advise HTI. When asked what he understood Cottingham & Butler had agreed to do, Mr. Hammond stated that they were "supposed to provide me the best insurance, and quotable insurance, they could find. And was going to help train our

10

drivers." [DE 25-2 at 70: 7-9.] Mr. Hammond made no mention of ongoing advisement in relation to the policy.

As to the solicitation materials, nothing therein suggests that Cottingham & Butler promised to advise HTI about paying its premiums or maintaining its coverage. [DE 26-1, Deposition Exhibit 50 at pp. 44-65.]

Third, it is unclear what exactly HTI means by "defendants' specific promises" since it does not cite to anything in particular. This most likely refers to statements that Mr. Maxwell made during the meetings with Mr. Hammond. Once again though, Mr. Hammond's deposition testimony indicates that there was no "specific promise" to advise, but rather only a contract to provide the "best insurance" available and assist in training drivers. [DE 25-2 at 70: 7-9.] Mr. Hammond stated that these were the things Mr. Maxwell mentioned in their face to face meeting. [DE 25-2 at 70: 16-18.] Therefore, a contract duty to advise cannot be inferred from Mr. Maxwell's statements during the in-person meetings with Mr. Hammond, nor has this Court been made aware of any other "specific promises" that might give rise to such a duty.

Fourth, the email exchanges between Mr. Maxwell and Mr. Hammond do not provide any insight into contract terms. The emails show that HTI and Cottingham & Butler were attempting to maintain HTI's insurance coverage and secure new coverage, but do not contain evidence of contract terms. The fact that Cottingham & Butler tried to keep HTI's insurance in place is not evidence that a contract obligation to do so existed.

There is no genuine issue of fact regarding the Plaintiff's contract claim because a jury could not find that Cottingham & Butler was contractually obligated to advise HTI on paying the Chartis premiums or otherwise maintaining the insurance policy. Based on the above mentioned evidence, a jury might reasonably find that Cottingham & Butler promised to procure the best liability coverage available for HTI, but an obligation to obtain

11

the best insurance coverage would not automatically encompass a duty to provide ongoing advice to HTI for the duration of the policy. A jury could not reasonably conclude that a "definite and certain" contract term requiring Cottingham & Butler to advise existed. *Kovacs*, 957 S.W.2d at 254. HTI's breach of contract claim cannot proceed without evidence showing the existence of such a contract term.

**C. Negligence Claim**

HTI also asserts a negligence claim against Cottingham & Butler. HTI claims that Cottingham & Butler "owed a duty to … competently and completely present the facts regarding the operation of [HTI's] business to Chartis and to present the facts and the options available to [HTI] on paying the Chartis premium [and] obtaining appropriate liability insurance." [DE 1-1, Complaint at ¶ 54.] Here, HTI is once again alleging a duty to advise. HTI expressly characterizes the duty as such in its Response. *See* [DE 26 at 23, 25.] Cottingham & Butler did not owe HTI a duty to advise, so Cottingham & Butler is entitled to summary judgment on the negligence claim.

"To succeed on a claim of negligence, the plaintiff must establish that (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached its duty, and (3) the breach proximately caused the plaintiff's damages. *Mullins v. Commonwealth Life Ins. Co.,* 839 S.W.2d 245, 247 (Ky. 1992). "The United States District Court for the Western District of Kentucky recently summarized the Kentucky law of negligence, as it applies to insurance brokers or agents and their clients as follows:

> The Supreme Court of Kentucky has held that, in general, insurance brokers and agents owe only a standard duty of reasonable care to their clients. *See Associated Ins. Serv[.], Inc. v. Garcia*, 307 S.W.3d 58, 63 (Ky. 2010). However, "an insurer may assume a duty to advise an insured when: (1) he expressly undertakes to advise the insured; or (2) he impliedly undertakes to advise the insured." *Mullins*, 839 S.W.2d at 248;

12

> *see also Dotson v. Grange Mut. Cas. Co.*, [No.2009–CA000482–MR,] 2010 WL 1133337 (Ky. Ct. App. Mar. 26, 2010). "An implied assumption of duty may be present when: (1) the insured pays the insurance agent consideration beyond a mere payment of the premium; (2) there is a course of dealing over an extended period of time which would put an objectively reasonable insurance agent on notice that his [advice] is being sought and relied on; or (3) the insured clearly makes a request for advice." *Mullins*, 839 S.W.2d at 248."

*Hardy Oil Co. v. Nationwide Agribusiness Ins. Co.*, No. 5:11-CV-00075, 2013 WL 5561039 (E.D. Ky. Oct. 8, 2013) (citing *Helton v. American General Life Ins. Co.,* Civil Action No. 4:09-cv-0018-JHM, 2013 WL 2242773, *12 (W.D.Ky. May 21, 2013)), aff'd, 587 F. App'x 238 (6th Cir. 2014).

Throughout its argument on its negligence claim, HTI mistakenly characterizes Mr. Maxwell as the insurance agent in this case. [DE 26 at 22-25.] ("Maxwell marketed, contracted and acted, at all times relevant, as the insurance broker/agent to HTI, the insured."). HTI argues that *Mullins* is inapplicable because "the key fact in *Mullins*, and the determining factor of that decision, was that the insurance agent was the agent of the insurer … Here, Maxwell was not an agent for the insurer when he sold the Chartis Auto Policy to HTI, because the insurer had not appointed Maxwell …" This argument is erroneous because, as already explained, Cottingham & Butler was the properly appointed agent of Chartis, and Mr. Maxwell was an employee working on behalf of Cottingham & Butler. *See supra* pp. 7-8.  Indeed, KRS 304.9-270(3), which HTI cites, requires that an insurance agent be appointed by an insurer before placing applications for insurance. This statute was satisfied because Cottingham & Butler was properly appointed as an insurance agent by Chartis, so *Mullins* and the legal rule from *Hardy Oil* outlined above applies in this case to determine whether Cottingham & Butler owed HTI a duty to advise.

13

Moreover, the alignment of the parties involved in *Hardy Oil* is analogous to the present case. In *Hardy Oil*, Nationwide Agribusiness Insurance Company was the insurer, and Wells Fargo, through its agent, Rollie Lehnus, obtained the policy for Hardy Oil. 2013 WL 5561039 at *1. The insured, Hardy Oil, asserted a negligence claim against Wells Fargo based on the actions of its agent, Lehnus. *Id.* at *2. In this case, Chartis is the insurer, and Cottingham & Butler, through its agent, Mr. Maxwell, obtained the policy for HTI. Likewise, HTI is asserting a negligence claim against Cottingham & Butler based on Mr. Maxwell's actions. The parties in this case line up precisely with the parties involved in *Hardy Oil*, which further indicates that *Mullins* is the correct legal standard to apply in this case.

Returning now to the *Mullins* analysis, the key question is whether Cottingham & Butler impliedly assumed a duty to advise HTI. The question of duty presents an issue of law. *Mullins*, 839 S.W.2d at 248 (citing 57A Am.Jur.2d *Negligence* §20; *Prosser and Keeton on Torts*, § 37 (5th ed. 1984)). HTI has the burden of proving that Cottingham & Butler assumed a duty to advise. *Id.*

First, Cottingham & Butler could have impliedly assumed a duty to advise by taking payment from HTI "beyond a mere payment of the premium." *Mullins*, 839 S.W.2d at 248. On July 20, 2012, HTI wired $70,000 to Cottingham & Butler. Of that amount, $15,204.44 "was applied to the outstanding C&B Fee Agreement invoices of #329477 ($13,500) and #330577 ($1,704.44 partial payment)." [DE 26-1, Exhibit 1, Deposition Exhibit 53 at p.68.] Thus, on July 20, 2012, HTI paid Cottingham & Butler a fee.

However, *Mullins* does not stand for the proposition that the payment of any sort of fee whatsoever automatically creates a duty to advise. Rather, under *Mullins* the payment of a fee beyond a premium *may* indicate that an insurance broker impliedly assumed a duty

14

to advise.[3] Here, the fee HTI paid to Cottingham & Butler did not create a duty to advise. Put simply, nothing about the fee suggests that Cottingham & Butler assumed a duty to advise HTI.

HTI's description of the fee agreement undermines its argument that the fee created a duty to advise. Mr. Hammond testified that he understood the fee agreement "to be that where the insurer paid a fee to Cottingham & Butler directly, HTI would itself pay nothing directly to Cottingham & Butler for any fee or commission. Otherwise, Hammond understood that if the premium payment by HTI to the insurer was 'net of fees,' HTI would pay Cottingham & Butler a fee equal to 6% of the premium." [DE 26 at 5.] According to Mr. Hammond, HTI owed Cottingham & Butler a fee only if Cottingham & Butler did not receive payment directly from Chartis. It does not make sense for a fee that allegedly created a duty to advise to be contingent upon Chartis not paying a commission. Rather, HTI's explanation of the fee arrangement actually supports Cottingham & Butler's argument that the fee was contemplated merely "in lieu of" a direct premium commission from Chartis and was not additional special compensation. [DE 25-1 at 21; DE 27 at 12.]

Moreover, other decisions have noted the difference between a fee that triggers a duty to advise and a fee paid for some other purpose. In *Settle v. Kentucky Farm Bureau Ins. Co.,* No. 2003-CA-000999-MR, 2004 WL 1093713, at *3 (Ky. Ct. App. May 14, 2004), the court held that a $25 yearly fee paid to an insurer was nothing more than an annual membership fee in a mutual insurance company and did not create an affirmative duty to

---

[3] The Court believes this concept may be more properly classified as a contract duty rather than a negligence principle. It seems that paying a fee for a higher standard of care, i.e. a duty to advise, is actually an exchange of consideration that would create a contractual agreement rather than a duty of care. *See Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 682 P.2d 388, 403 (Ariz. 1984) (explaining that limiting the liability of an insurance agent to those situations in which the insured provided separate consideration for the agent's advice "confuses contract and tort principles and is irrelevant to the allegation of negligence."). However, since *Mullins* is the controlling Kentucky law, the Court will proceed to analyze this issue in terms of negligence.

advise the insureds. While HTI paid Cottingham & Butler a fee much greater than $25, the same logic applies here. HTI's bare payment of the fee, without any other evidence indicating that the fee was paid to secure Cottingham & Butler's advisement or other special assistance, does not show that Cottingham & Butler assumed a duty to advise by taking the payment.

The second way an insurance agent may impliedly assume a duty to advise is by "a course of dealing over an extended period of time which would put an objectively reasonable insurance agent on notice that his [advice] is being sought and relied on." *Mullins*, 839 S.W.2d at 248. While the question of duty generally presents an issue of law, whether such a special relationship existed is a question of fact. *See Hardy Oil*, 2013 WL 5561039 at n.5; *St. Paul Fire & Marine Ins. Co. v. CEI Florida, Inc.*, 864 F. Supp. 656, 673 (E.D. Mich. 1994) ("The existence of a special relationship is a question of fact."). In the present case, HTI and Cottingham & Butler were involved for less than a year – from "late 2011" to August 2, 2012. [DE 26 at 2, 14.] There is no evidence that anything beyond a standard insurance broker to insured arrangement existed. This was the first time they did business together, so there is no prior course of dealing between the parties. No reasonable juror could find that a duty to advise arose from this short-lived relationship.

Third, a duty to advise may be present when "the insured clearly makes a request for advice." *Mullins*, 839 S.W.2d at 248. HTI did not make a clear request for advice. A request for the "best policy," which HTI made in this case, does not impose a duty to advise. *Id.* at 249. The emails and other communications between HTI and Cottingham & Butler also do not reveal a clear request for advice. *See* [DE 26 at 11-14.] These communications show that HTI and Cottingham & Butler were trying to maintain the Chartis coverage and, after its cancellation, restore it or acquire new coverage, but neither HTI nor Mr. Hammond made a clear request seeking advice about the Chartis auto liability policy.

16

Summary judgment on HTI's negligence claim is warranted because Cottingham & Butler did not owe a duty to advise.

**D. Disgorgement Claim**

HTI claims that Cottingham & Butler "wrongfully withheld $20,500 . . . on a refund from Chartis on the Property Damages Policy."

In its Response opposing summary judgment, HTI does not offer any reasons why summary judgment should not be granted on this claim. In fact, the evidence shows that of the $72,021 refund related to the physical damages policy, Cottingham & Butler sent $58,822.78 to First Insurance Funding and transmitted the remaining $13,198.22 back to HTI. [DE 25-2 at 133:14-135:15.] Thus, contrary to HTI's assertion that Cottingham & Butler withheld $20,500 of the property damages policy refund, Cottingham & Butler actually retained no part of that refund. Since it did not keep any of this money, Cottingham & Butler has nothing to disgorge. Accordingly, summary judgment is appropriate on this claim.

**E. Premium Refund Claim**

Finally, HTI alleges that Cottingham & Butler "improperly paid Imperial an amount in excess of what should be due to Chartis on the Amended Chartis Policy Premium because the Estimated Mileage is overstated by at least 1,000,000 miles." [DE 1-1, Complaint at ¶ 58.]

Like the Disgorgement claim, HTI does not specifically defend its Premium Refund claim in its Response. Once again, it was HTI's representative that provided the overstated mileage estimate to Cottingham & Butler. *See supra* pp.7-8. Therefore, Cottingham & Butler did not cause any loss that HTI suffered based on the overstatement of miles, including any premium overpayment to Imperial. Summary judgment on this claim is also appropriate.

In addition, this Court has already held that HTI's breach of contract and negligence claims may not proceed, so HTI cannot recover any alleged excess premium payments as a component of damages under either of those claims.

## IV. CONCLUSION

There is no issue of material fact regarding HTI's breach of contract, negligence, disgorgement, or premium refund claims and the defendants are entitled to judgment in their favor on each claim. Accordingly, IT IS HEREBY ORDERED that the defendants' motion for summary judgment [DE 25] is GRANTED.

Dated March 29, 2016.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY